UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Alan Watt,

          Plaintiff,

v.                                                    Case No. 14-cv-3167 (JNE/JJK)
                                                      ORDER
City of Crystal, and Stephanie Revering,
Chief of the Crystal Police Department, and
Anne Norris, City Manager
(individually and in their official capacities),

          Defendants.


        This matter is a disability discrimination and retaliation suit brought by Plaintiff Alan

Watt, a former police officer in the Crystal Police Department, against the City of Crystal,

Crystal Police Chief Stephanie Revering, and Crystal City Manager Anne Norris. The matter is

before the Court on Defendants' motion for summary judgment. For the reasons provided below,

Defendants' motion is granted and Watt's claims are dismissed.

## BACKGROUND

        Watt was hired as a police officer for the City of Crystal in 1996. He typically received

somewhat favorable reviews that included criticisms of his work performance. However, in early

2012, Watt had marital problems and his conduct at work suffered. In February 2012, the City

received a complaint from an individual who alleged that Watt used police intelligence to track

down his address, where Watt knocked on the door and asked for the whereabouts of Watt's

wife. An investigation by the City concluded that Watt accessed the Department of Vehicle

Services (DVS) database on four occasions to obtain information about the individual, who

during the investigation admitted to having an intimate relationship with Watt's wife. Watt

claimed he looked up the individual's information because he was concerned for the safety of his family. However, the City concluded that the DVS accesses were unlawful because they lacked a specific law enforcement purpose and, in April 2012, then-Chief John Banick suspended Watt for 12 hours without pay.

In June and July, Watt complained about the suspension to Kim Therres, the assistant city manager and human resources manager. On October 7, 2012, Watt sent Therres an email, which it seems he later forwarded to Norris. The email states in full:

> I have had a chance to review the council meeting regarding the Ramirez family's situation with former Chief Banick. This is the same type of behavior I expressed to you regarding my suspension for violating city policy while others who committed the same offense were left alone. The fact that you only seemed interested in finding out what info I had was discouraging, adding proof that as a council member stated that "we have to protect the city". You're not interested in doing the right thing only protecting yourselves from obvious wrong doing at the very least looking bias[ed] against minorities. So, I ask yet again what steps if any have been taken regarding my complaint against Banick for his disgraceful conduct? Or will this incident be ignored / covered up further?

The Ramirez family situation mentioned in the email involves a complaint filed with the City on September 6, 2012 by a group known as Communities United Against Police Brutality (Communities United). The group alleged that the Crystal Police Department failed to investigate earlier complaints that the Metro Gang Strike Force unlawfully dispossessed the Ramirez family of its home and property following a search of the family's Crystal apartment. Watt had no formal involvement with the matter. He first learned of the Ramirez family situation when he reviewed the video of the public city council meeting on the matter, prior to sending the October 7 email.

On October 12, Norris replied to Watt, stating: "If you can give me specifics, I can take further action as appropriate." Watt replied to Norris on October 14. That email, in its entirety, states:

As I informed Kim Therres[,] former Chief Banick suspended me without pay for violation of policy. Prior to the suspension Banick stated he was aware of other officers who violated the same policy. It wasn't until after my suspension that I discovered that this was true, yet these individuals were not spoken to, written up or suspended as I was. When I informed Therres she seemed more interested in finding out what I knew instead of the obvious bias of Banick, not even asking him about it in a general inquiry. So, my questions once again are why [is] the only minority officer [Watt] suspended when other officers are allowed to commit the same offense left alone? Why was Lt. Gustafson sent to my home and interrogated my son regarding my whereabouts when my supervisor was advised that I was not coming in? Why former Chief Banick, Chief Fealy [now Revering],[1] Lt.Gustafon are allowed to commit acts which are morally, ethically and legally wrong allowed to continue without consequence? The first time I came to you for help the bulls eye on my back got bigger resulting in suspension, second time you didn't have time for me and I'm sure this time I'll be punished in some way. All I asked for was consistency from people who are in charge, consistency being fair and just to all not only fan favorites.

One or two days later, Revering called Watt into a meeting to discuss an incident in which Watt had left his sidearm disassembled in the squad room. The incident had occurred several months earlier. However, it is undisputed that Revering did not learn about the gun incident until shortly before she called the meeting with Watt. Watt admitted to Revering that he had removed, disassembled, and left his sidearm in the squad room. On October 19, Revering placed Watt on paid administrative leave. Watt was directed not to discuss his personnel issues with anyone other than his legal and union representatives, not to be present on city property or attend city events during his leave, and not to contact his coworkers while on leave, among other conditions. On October 23, Watt's union counsel emailed the City's attorney to ask why Watt was placed on leave. The City's attorney responded that the City was reviewing the matter to determine whether discipline was warranted.

The City conducted an investigation into whether the gun incident violated department policy. The investigation was completed on January 29, 2013. It found that, during the incident,

---

[1]    In many places, the record refers to Defendant Revering as Fealy, which was her married name before she was divorced.

Watt took his gun from his holster, removed the magazine and the bullet from the chamber, and left them on a desk or table in the squad room. Watt then left the room to meet with Banick and Revering. But before he left, the report found, "Watt made a statement intimating that he should not have his gun with him when he went upstairs to talk to people." The report concluded that Watt's removal of his sidearm violated department policy.

The City referred Watt for a psychological Fitness for Duty Evaluation (FFDE) performed by Dr. Robert Peterson. Peterson's psychological report, issued on March 29, 2013, determined that "Watt is able to safely perform his duties as a peace officer at this time." It found "no psychological impairment or condition at this time that would prevent him from safely performing those duties." However, it concluded that "it will be very important that he remain in therapy with his individual therapist in order for him to process anger, frustrations and suspicions."

By letter dated April 18, Revering suspended Watt for 30 days without pay for the gun incident and other personnel issues. Revering also directed Watt to "participate in private anger management therapy and therapy aimed at your issues of distrust of superiors" and to "provide periodic written reports to Human Resources from your private therapist about your progress in these areas every four months." Watt's union counsel objected to the therapy conditions, asserting that "the City does not have the authority to decide how long that therapy will continue, nor does the City have the authority to require periodic reports from Officer Watt's private therapist."

Later that month, Watt, who is African-American, filed a race discrimination charge against Crystal with the Equal Employment Opportunity Commission (EEOC) and the Minnesota Department of Human Rights (MDHR). The charges were later dismissed.[2]

On May 7, Watt emailed Lisa Lynn, a psychologist and consultant who had previously worked with the City, to say that he was "targeted" by Norris and Revering and to ask Lynn to call him. Lynn had a brief telephone conversation with Watt and also met in person with Revering, who told Lynn about Watt's gun incident. On June 1, Lynn wrote a letter to Revering, concluding: "In my professional opinion which is based on an email sent from Officer Watt, a telephone discussion with Officer Watt and a discussion with Chief Revering, Officer Watt is likely in need of professional counseling and/or stress management coaching to ensure he has control of his own mental, physical and emotional states in both personal and professional realms." Lynn suggested that Watt take part in stress management or counseling before returning to duty. Based on Lynn's memo and opinion, Revering placed Watt on home assignment, until further notice, effective June 3. On home assignment, Watt was expected to be available at his home telephone during the hours of 9 a.m. to 5 p.m. Watt received no assignments while on home assignment.

On June 16, Watt signed a statement submitted to the city council that complained about the discipline he had received and concluded that "all of the things that have happened to me are retaliation for complaining about misconduct by police management, especially my complaint about the Ramirez cover up."

---

[2]     On July 24, 2013, the EEOC issued a right to sue letter informing Watt he had 90 days to file a lawsuit based on his allegations of race discrimination. Watt filed this lawsuit approximately one year later. He does not assert a race discrimination claim in this lawsuit.

On July 1, the City requested that Watt authorize direct communication with his private therapist. Watt refused. On July 3, the City reiterated that Watt must participate in therapy and provide written status reports from his therapist. The next status report, the City stated, was due by the end of July. On July 15, the City wrote to Dr. Peterson to ask for clarification about the meaning of his report's statement that "it will be very important that [Watt] remain in therapy with his individual therapist in order for him to process anger, frustrations and suspicions." Dr. Peterson wrote back to explain that the therapist would determine the treatment plans and benchmarks.

Meanwhile, Watt submitted a letter, dated July 18, 2013, from his therapist. Therres informed Watt that the therapist's letter was insufficient and requested more detailed information. Watt refused, stating: "Considering my rights under HIPPAA [sic], I have cooperated fully." Therres then notified Watt he had until September 6 to comply or face discipline, up to and including termination. Before the deadline, Watt's therapist provided a report that satisfied the City's demands. The report stated that Watt was fit for duty as a police officer and took issue with Lynn's opinion.

In a memo dated September 11, 2013, Revering recommended to Norris that the City terminate Watt. Watt was not terminated at that time. Instead, by a letter dated September 24, Watt was directed to return to work in a modified assignment that prohibited carrying a gun.

In mid-October, Watt was suspended for 15 days. The suspension was in part for violations that occurred during his home assignment. In particular, during working hours on July 15, Watt had attended a rally organized by Communities United. On July 18, Revering had called Watt's home telephone during work hours and Watt had not picked up. The City found that Watt had not been available at his home phone on these dates, as instructed.

Watt returned to work and, in January 2014, was back on active duty street patrol. Watt was informed that his next therapy report was due by the end of January. On January 7, Watt indicated to Revering he would not submit the report. About one week later, Watt's union counsel reiterated its position that the City did not have authority to mandate such reports. As an alternative, counsel suggested a reevaluation of Watt's fitness for duty. On January 28, Watt's employment counsel objected that the requests for Watt's therapy reports were harassment and discrimination based on Watt's perceived disability and retaliation for Watt's prior complaints.

Effective February 1, the City placed Watt on leave pending a second psychological evaluation. The City referred Watt for an evaluation scheduled for February 18. A few days before that date, Watt informed Norris that he had documentation from his therapist stating he had completed therapy. The City's attorney notified Watt's union counsel that Watt was expected to attend the evaluation. Watt sent the therapist's letter to Norris but Watt did not attend the evaluation.

On February 21, 2014, Norris terminated Watt effective February 28. She provided several reasons for the decision, including that Watt had demonstrated a "complete unwillingness to follow department policies and directives" and that, without the second evaluation, "we are currently unable to ascertain your ongoing fitness for duty."

Watt filed suit in state court, and Defendants removed to this Court. Watt brings a disability discrimination claim under the Minnesota Human Rights Act (MHRA), a First Amendment claim, a MHRA reprisal claim, and a Minnesota Whistleblower Act claim. Defendants have moved for summary judgment as to all claims.

**STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must view facts that the parties genuinely dispute in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**DISCUSSION**

**I.   Disability Discrimination Claim**

The MHRA prohibits discrimination based on an employee's disability. Minn. Stat. 363A.08. To survive summary judgment on his disability discrimination claim, Watt must establish a prima facie case by showing: (1) he is disabled; (2) he is qualified to perform the essential functions of the job; (3) he suffered an adverse employment action; and (4) the circumstances of the adverse action give rise to an inference of discrimination. *See Kozisek v. County of Seward, Nebraska*, 539 F.3d 930, 934 (8th Cir. 2008). The burden then shifts to Defendants to provide legitimate, nondiscriminatory reasons for the adverse actions. *Id.* at 935. The burden then shifts to Watt to demonstrate these reasons are pretext for discrimination. *Id.*

Defendants assert that Watt's claim fails because he was a "direct threat." Employees who pose a serious threat to the health or safety of others are not protected by the MHRA. Minn. Stat. § 363A.25. Defendants bear the burden of proving this defense. *Id.* Because the Court finds that Watt has failed to meet his burden of establishing his prima facie case and showing pretext, the Court does not reach the issue of whether Defendants have proved the direct threat defense.

### A.   "Regarded As" Disabled

Watt's claim fails at the first element of his prima facie case. Under the MHRA, a "disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." Minn. Stat. Ann. § 363A.03, subd. 12. Watt does not assert that he was in fact disabled. Instead, Watt asserts that Defendants "regarded" him as disabled because Defendants "regarded Watt as having exhibited erratic or angry behavior that left them concerned he could not perform his duties and had some mental or emotional issue they determined required him to continue therapy and provide status updates."

While Defendants may have believed that Watt had anger management problems that compromised his ability to perform some duties of a police officer, there is a difference between being perceived as impaired and being perceived as unable to perform a job duty. The Eighth Circuit Court of Appeals recently made this distinction clear in *Fischer v. Minneapolis Public Schools*, 792 F.3d 985 (8th Cir. 2015), where it held that the employer's belief that an employee "possesses less than the required strength to perform a physically demanding job" is "not equivalent to a belief that [the employee] suffered a physical impairment." *Id.* at 989. The same holds true for mental impairments. An employer's belief that an employee lacks the capacity to perform aspects of a mentally and emotionally demanding job does not mean the employer

believes the employee has a mental impairment. This distinction is especially important for police departments because they "place armed officers in positions where they can do tremendous harm if they act irrationally." *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999). Defendants' belief that Watt was, for some months, too angry or erratic to carry a firearm or patrol the streets does not show that Defendants regarded him as disabled within the meaning of the MHRA.

Defendants' requirements that Watt continue in therapy and provide them with progress reports also do not show that they regarded him as impaired. "If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability." *Wisbey v. City of Lincoln, Neb.*, 612 F.3d 667, 672–73 (8th Cir. 2010). Here, Dr. Peterson, the evaluating psychologist, stressed that it was important for Watt to continue therapy, even though he had not found a psychological impairment. Defendants' decision to adopt reporting requirements in line with Dr. Peterson's opinion shows that they too believed therapy was important for Watt, but it does not show that they regarded Watt as disabled.

Finally, the referrals for psychological exams also do not show Defendants regarded Watt as disabled because a "request for an evaluation is not equivalent to treatment of the employee as though she were substantially impaired." *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998). "Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to [disability discrimination] claims." *Id.* The fact that Defendants took reasonable steps to ascertain the extent of Watt's mental and emotional issues does not mean they perceived him as disabled.

## B. Adverse Actions, Causal Connections, and Pretext

Watt fails to meet his burden in other ways too. He identifies several personnel decisions, but not all of these constitute adverse employment actions. *See Sellers v. Deere & Co.*, 791 F.3d 938, 942 (8th Cir. 2015) ("An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage."). Where Watt has suffered an adverse employment action, he has failed to show a causal connection or pretext. *See Allen v. Interior Const. Services, Ltd.*, 214 F.3d 978, 982 (8th Cir. 2000) (noting that a causal connection can be shown with "any credible evidence tending to establish that an employer acted adversely to an individual on account of his disability") (internal quotation marks omitted); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). ("An employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.").

### 1. *Requests for Medical Information/Exams*

Watt asserts that the "mandated and repeated medical updates" were adverse actions. The Court finds otherwise because the medical exams and the requests for therapy reports did not produce a material employment disadvantage. The exams and therapy reports themselves did not affect Watt's pay, benefits, work duties, or work conditions. *See Jenkins v. Medical Laboratories of Eastern Iowa*, 880 F. Supp. 2d 946, 961 (N.D. Iowa 2012) (finding that a requirement to attend Employee Assistance Program counseling sessions did not constitute an adverse action); *Gard v. U.S. Dep't. of Educ.*, 752 F. Supp. 2d 30, 37 (D.D.C. 2010) (finding that an employer's

"request for current medical information [was not] materially adverse" but rather "a minor inconvenience").

Watt asserts that Defendants must show their requests and referrals were supported by a "business necessity" and were "no broader or more intrusive than necessary." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).[3] Watt argues Defendants have failed to meet their burden. Defendants did not require Watt to submit his full health records, and they did not request information about Watt's personal affairs. Rather, their requests were specifically tailored to gather information about Watt's progress as to his anger and distrust of superiors, which the evaluating psychologist had identified as areas of concern that might impact Watt's ability to perform his job. Accordingly, the Court finds the requests were a business necessity and were not unduly broad or intrusive. *See id.* (holding that defendants' "focused request for a limited portion of [plaintiff's] medical records was no broader or more intrusive than necessary").

With respect to the referrals for psychological evaluations, they too did not violate the MHRA. The first psychological evaluation was a reasonable means for Defendants, having learned about Watt's troubling behavior during the gun incident and aware of the private stress in his life, to ascertain whether Watt was psychologically fit for the rigors of active police work. *Wisbey*, 612 F.3d at 673 (holding that a psychological fitness-for-duty exam was lawful where an emergency dispatcher had depression). As for the second psychological examination, the referral was made nearly a year after the first psychological exam was conducted. In the meantime, Watt had violated directives from his superiors, suggesting he might still have anger or distrust toward them. For example, Watt had not complied with the conditions of his home assignment. Had Watt showed up for the second exam, its results could have alerted Defendants to whether

---

[3]     *Thomas* addressed a provision in the Americans with Disabilities Act, 42 U.S.C. § 12112(d)(4). Both Plaintiff and Defendants assume the same inquiry applies under the MHRA.

continued anger management counseling was needed or whether Watt was fit for duty without further therapy.

    *2.  Suspensions*

Lengthy suspensions of a month or more have been found to constitute adverse employment actions. *See Burlington N. v. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 73 (2006). Allegations of shorter suspensions without pay have also been held to constitute adverse actions. *See, e.g., Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). The Court will assume that all three of Watt's suspensions were adverse actions. Nevertheless, for each suspension, the Court finds that Watt has failed to provide sufficient evidence of discrimination.

With respect to Watt's first suspension for improperly accessing the DVS database, there is no causal connection between the suspension and any perception about Watt's mental and emotional state. Watt points to nothing in the record showing that Defendants were concerned about his mental state in April 2012 when he was suspended for the DVS incidents. There is also no persuasive evidence of pretext. Watt argues that other officers were not disciplined as harshly for accessing the DVS database in ways Watt considers improper. There is, however, no information from which to conclude that any other officer's use of the DVS database was comparable to Watt's. The state of the law with respect to when some law enforcement "look-ups" violate the Driver's Privacy Protection Act, 18 U.S.C. § 2721 *et seq.*, is somewhat murky. Certainly, though, an officer may not use the DVS database to locate and go to the residence of a spouse's suspected lover. *See Margan v. Niles*, 250 F. Supp.2d 63, 66–69, 77 (N.D.N.Y. 2003).

The primary stated reason for the second suspension was Watt's mishandling of his firearm. Watt does not produce evidence undermining this rationale. Other officers may have removed their side arms or mishandled their weapons at times, but Watt does not identify any

officer who simultaneously engaged in conduct or communication comparable to Watt's intimation that he should not be armed when meeting with his superiors. Moreover, while there was a substantial gap in time between when the gun incident occurred and when Watt was punished, it is undisputed that Revering first became aware of the gun incident in October 2012, at which time she promptly investigated the matter. The record shows that Revering acted based on troubling and objective evidence about Watt's behavior and not on discriminatory fears.

The third suspension is justified by several reasons, including that Watt violated his home assignment when he was not available at his home phone during assigned hours. Watt offers no evidence tying this 15-day suspension to Defendants' perception of his mental state. Watt suggests that Revering only became aware that Watt violated his home assignment because she was checking to see whether Watt was following her directive to stay at home. This fact, though, does not show that her stated reason for suspending him was pretext for unlawful discrimination.

3. *Administrative Leaves and Accompanying Restrictions*

Watt also suggests that his administrative leaves were adverse actions. Watt was first placed on leave when the City was investigating the gun incident. Being placed on administrative leave pending an internal investigation is not an adverse action. *See Singletary v. Mo. Dep't of Corrs.,* 423 F.3d 886, 891–92 (8th Cir. 2005). Watt also asserts in passing that the restrictions accompanying the extended leave were adverse actions. The Court disagrees. These temporary conditions were put in place to ensure that the City could complete its investigation without interference from Watt and without concern that Watt would pose a threat to others before the City could determine if more permanent precautions or accommodations might be necessary.

Watt was again placed on leave for a short period before the second scheduled FFDE. The Court finds that Revering's decision to place Watt on administrative leave with pay to allow

time to determine whether Watt was fit for duty after he failed to provide a timely report on the progress of his therapy, as directed, was also not an adverse action. *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007–08 (8th Cir. 2012) ("Placement on paid administrative leave pending an investigation does not meet this standard [for adverse employment action].").

### 4. *Home Assignment and Accompanying Restrictions*

Watt has adduced evidence sufficient to support a finding that his home assignment was an adverse employment action. "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington Northern*, 548 U.S. at 71. In determining whether a reassignment is an adverse action, a court may consider tangible factors, such as salary and benefits, as well as intangible factors. *See Meyers v. Nebraska Health & Human Servs.*, 324 F.3d 655, 660 (8th Cir. 2003).

Here, Watt was placed on home assignment indefinitely. During the approximately five months he was ultimately on home assignment, he received no assignments. Instead of performing active patrol and police work, he stayed at home. Based on this record, a jury could reasonably conclude that Watt's home assignment materially changed his work conditions. *See id.* (holding that a reassignment with no change in pay and benefits could support a jury finding of a material employment change where there was "evidence of a considerable downward shift in skill level required" for the new job duties, "coupled with evidence of a [reduced] work load").

Defendants, though, have offered legitimate reasons for the home assignment that Watt has not adequately rebutted. They have shown that the home assignment was based on the gun incident and Lynn's professional opinion that Watt should take part in stress management

counseling before returning to duty. *See Kozisek*, 539 F.3d at 935 (holding that the employer's requirement that an employee complete inpatient alcohol treatment was lawful where it was "based upon, first, a very serious incident which resulted in criminal charges against [the employee], and then most importantly, a licensed mental health therapist's recommendation"). Watt asserts that Defendants' "clinging reliance on Lynn's letter to force Watt out of the workplace" is evidence of pretext. It is true, as Watt asserts, that Lynn was not contracted by the City to perform an exam and did not in fact examine him. By contrast, Dr. Peterson's opinion was based on a full mental status evaluation. But while Lynn was not an examining psychologist, she was a licensed psychologist who formed a professional opinion based on her qualifications, her experience working with public safety professionals, evidence about Watt's behavior, and a brief conversation with Watt. It was not unreasonable for Revering to rely on this opinion and such reliance does not show pretext.

5.  *Termination*

Watt's termination was undoubtedly an adverse employment action. Defendants have offered several reasons justifying the termination. The notice of termination states: "Your employment record contains reasons for discipline for not following directives, for uncontrolled anger and for disrespect of supervisors." It also notes that, without the second FFDE, "we are currently unable to ascertain your ongoing fitness for duty." The letter concludes that Watt is terminated based on "your recent actions, your lack of credibility, undependability and your complete unwillingness to follow department policies and directives of your supervisors."

The record supports Defendants' reasons for termination. The record contains undisputed evidence of several instances in which Watt did not follow directives, as well as evidence that Defendants were legitimately concerned about Watt's anger and his lack of respect for his

superiors. Moreover, Watt's failure to attend the scheduled psychological evaluation is also a legitimate reason for termination. *See Thomas*, 483 F.3d at 531.

Watt fails to rebut these legitimate reasons with persuasive evidence of pretext. The record contains no evidence of employees who were similarly situated in all relevant respects but who received less severe punishment. *See Fiero v. CSG Systems, Inc.*, 759 F.3d 874, 879 (8th Cir. 2014) (stating that, at the pretext stage of *McDonnell Douglas*, the plaintiff has the burden of proving that comparators "were similarly situated in all relevant respects"). Watt points out that his disciplinary record during his first 17 years on the force was starkly different than during his last year and a half. This fact, though, does not show discrimination. Watt's disciplinary history changed because he began exhibiting troubling behaviors, such as his misuse of the DVS database and mishandling of his gun. The record shows that Defendants punished Watt not because of a perceived disability, but because he repeatedly violated directives and rules.

### 6. Miscellaneous

In addition to the personnel actions discussed above, Watt also asserts in passing that adverse actions against him included "unprecedented scrutiny," "investigations," "denial of promotional opportunities," and "publicizing private medical records." The scrutiny and investigations by themselves were not material changes to Watt's employment. *See Altonen v. City of Minneapolis*, 487 F.3d 554, 560 (8th Cir. 2007) ("Internal investigations into employee complaints are not adverse employment actions when they do not result in any change in form or condition to the employee's employment."). Even if the Court were to assume otherwise, Defendants had legitimate, non-pretextual reasons for them, such as Watt's behavior during the gun incident. With respect to promotional opportunities, Watt has not explained how he was denied these opportunities, identified any positions he was denied, adduced any evidence to

show he was qualified for promotions, or shown that similarly situated officers received promotions. Finally, with respect to the publicizing of his medical records, Watt presumably refers to the discussion Revering had with Lynn about Watt's behavior. Watt has not shown how any disclosure of his medical information constituted a material change to his employment conditions or was based on improper motives.

For all of the above reasons, Watt's disability discrimination claim fails.

## II.     First Amendment Claim

There are two distinct parts to Watt's First Amendment claim. First, Watt alleges that the disciplinary actions against him were unconstitutional retaliation. Second, Watt alleges that the conditions placed on his speech violated his First Amendment rights. For both parts, Defendants' chief defense is qualified immunity. Both parts of Watt's claim fail for the reasons provided below.

### A.   Qualified Immunity and First Amendment Framework

Before undergoing a qualified immunity analysis, the Court must determine whether each side has a sufficient interest at stake. *See Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 832–33 (8th Cir. 2015). The Court must ask: (1) "whether the employee spoke as a citizen on a matter of public concern;" and (2) "whether [the employer] has produced evidence to indicate the speech had an adverse impact on the efficiency of the [employer's] operations." *Id.* at 833 (internal quotation marks omitted) (alteration in original). "To determine whether speech qualifies as a matter of public concern, we must examine the content, form and context of the speech, as revealed by the whole record." *Id.* "When speech relates both to an employee's private interests as well as matters of public concern, the speech is protected if it is primarily motivated by public concern. If the main motivation for the speech was furthering [the employee's] private

interests rather than to raise issues of public concern, her speech is not protected, even if the public would have an interest in the topic of her speech." *Id.* (internal citations and quotation marks omitted).

The qualified immunity analysis itself has two prongs:  (1) whether the alleged facts demonstrate a violation of the employee's constitutional rights; and (2) whether that right was clearly established at the time of the adverse action. *Id.* at 832. The first prong relies on the *Pickering* balancing test, which examines: (1) the need for harmony in the work place; (2) whether the government's responsibilities require close working relationships; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest; and (6) whether the speech impeded the employee's ability to perform his duties. *Id.* at 835. This inquiry into whether speech is protected is one of law, not fact. *Id.* at 832.

 "Although the defendant bears the burden of proof for this affirmative defense [of qualified immunity], the plaintiff must demonstrate that the law was clearly established." *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014). "A right is clearly established if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotation marks omitted).

Even where there is no qualified immunity, a plaintiff bringing a First Amendment retaliation claim must still establish his prima facie case, which requires showing: "(1) that he engaged in a constitutionally protected activity; (2) that the defendant took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated in part by [the] exercise of his constitutional rights." *Scheffler v. Molin,* 743 F.3d 619, 621 (8th Cir. 2014).

### B.  First Amendment Retaliation

Watt does not dispute that some of his speech involved employee grievances that were not matters of public concern and thus not protected. However, he argues that his reports about corruption and criminal acts, specifically his reports about the Ramirez family, involved a matter of public concern. Watt does not identify the specific speech he believes supports his claim. The Court's own review of the record suggests there are several plausible candidates, though none of the activities and resulting discipline is ultimately sufficient to support a finding of liability.

#### 1.  *Watt's October 2012 Emails*

Watt's October 2012 emails to Norris, reproduced in their entirety above, reference the Ramirez family. However, any reasonable reading of the emails makes clear that they are primarily concerned with Watt's personnel issues and not the Ramirez family incident. The emails' focus is on the perceived unfairness of the suspension Watt received from then-Chief Banick for his misuse of the DVS database. Watt sent the emails to Norris, who was superior to the police department leadership and superior to Therres, to whom Watt had originally complained about the suspension. The emails followed up on and escalated his complaint about the suspension.

In his brief, Watt characterizes the emails as "reports" that Banick and Revering were involved in a cover-up. However, this mischaracterizes the text and context of the emails. At the time of the emails, the allegations of a cover-up had already been filed on behalf of the Ramirez family and the Crystal city council had already discussed them at a public meeting, as acknowledged in the text of the October 7 email. The emails did not report a new cover-up or provide new insight or information about the existing allegations of a cover-up.

In fact, the emails make only passing reference to the Ramirez family incident. The only express reference to the incident comes from the first line of the October 7 email, which begins by noting how Watt had "review[ed] the council meeting regarding the Ramirez family's situation." The email, though, immediately turns the focus to Watt's complaint about his suspension, stating: "This is the same type of behavior I expressed to you regarding my suspension for violating city policy while others who committed the same offense were left alone." Throughout the email, the focus is on Watt's personnel matter.

The October 14 email does not expressly reference the Ramirez family incident but only alludes to "morally, ethically and legally wrong" acts by police department leaders. Throughout this email too, the focus is on Watt's suspension and the perceived unfairness of that punishment.

The Court's "responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state." *Connick v. Myers*, 461 U.S. 138, 147 (1983). "If the main motivation for the speech was furthering [Watt's] private interests rather than to raise issues of public concern, [his] speech is not protected, even if the public would have an interest in the topic of [his] speech." *Altonen*, 487 F.3d at 559. While Watt's emails mention or allude to the Ramirez family incident, the emails are primarily concerned with Watt's complaint about the discipline he received months earlier in an unrelated matter. The emails are most accurately characterized as a private employee grievance and not as reports on a matter of public concern. Therefore, the Court finds that the emails do not involve protected speech.[4]

---

[4]     Watt does not argue that his emails are protected because they allege racial discrimination in the application of a police department policy. *See Connick v. Myers*, 461 U.S. 138, 148 n. 8 (1983) (determining that racial discrimination is a matter of public concern). If

2.  *Watt's Team Meeting with Revering*

On October 15, 2012, Watt and other members of his team met with Revering to discuss her vision for the department. Watt asserts that he spoke about corruption at the meeting and cites to his deposition testimony as support. Watt testified that he discussed how former-Chief Banick's decisions had damaged relations in the unit and that he told Revering, "if she was sincere in her vision for the department, I think a good thing to do would be to put Sergeant Erkenbrack back on the SWAT team, where he belongs." Based on his testimony, the Court finds that Watt's statements at the meeting involved internal police department relations and staffing issues that are not matters of public concern and thus not protected speech.

3.  *EEOC Complaint*

The Court assumes that Watt's complaint to the EEOC and cross-filed with the MDHR was a matter of public concern. *See Greenwood v. Ross*, 778 F.2d 448, 457 (8th Cir. 1985). The Court further assumes that Defendants would not receive qualified immunity if they had in fact punished Watt for filing his complaint. Nevertheless, Watt fails to establish a prima facie case of retaliation with respect to the complaint.

"[T]emporal proximity between protected activity and an adverse employment action can contribute to establishing the third element of a prima facie case of retaliation." *Davison v. City of Minneapolis,* 490 F.3d 648, 657 (8th Cir. 2007). However, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation," and a case built on temporal proximity "is undermined

---

Watt had made this argument, it would have failed. The emails' reference to Watt's status as a racial minority does not change the fact that the emails are most accurately characterized as an individual employee grievance that is afforded limited First Amendment weight in contrast to the police department's interest in maintaining discipline and harmony. *See Crain v. Bd. of Police Comm'rs of Metro. Police Dep't of City of St. Louis*, 920 F.2d 1402, 1410, 1412 (8th Cir. 1990). The same is true of Watt's earlier complaints about his suspension to Therres.

where the allegedly retaliatory motive coincides with the non-retaliatory motive." *Skalsky v. Independent School Dist. 743*, 772 F.3d 1126, 1131 (8th Cir. 2014). Here, the June 3, 2013 home assignment is the adverse action closest in time to the April 26, 2013 filing of the EEOC complaint. Defendants have shown that the home assignment was based on the gun incident and Lynn's opinion. The temporal proximity between the filing of the complaint and the home assignment is not close enough, by itself, to undermine Defendants' legitimate reasons for the home assignment. Nothing else in the record connects the filing of the complaint to the home assignment and casts doubt on Defendants' stated reasons. Accordingly, Watt has not presented a trial-worthy issue with respect to whether he was retaliated against for filing the EEOC complaint.

Any other adverse action is too remote in time to establish a causal link with the filing of the complaint. *See Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 833 (8th Cir. 2002).

### 4. Watt's Statement to the City Council

The June 16, 2013 statement signed by Watt purports to recount Watt's reports regarding the Ramirez family incident and the discipline Watt received as a result. The statement declares that this discipline shows retaliation for Watt's "complaint about the Ramirez cover up." At the time Watt signed the statement, the alleged cover-up of the Ramirez family incident had been public for many months and investigated by the City. Both an independent investigator and the City's prosecutor had already concluded that no improper cover-up had occurred. Watt's statement provided no new or newsworthy information about the matter. Nevertheless, the Court will assume the statement addressed a matter of public concern because it discussed how a public employee was treated after allegedly speaking out on a matter of public concern.

The next step in the inquiry is to assess whether Defendants can show the speech had an adverse impact on the efficiency of the police department's operations. In making this determination, the Court must give "considerable judicial deference" to Defendants' determination that Watt's speech caused disruption because "*espirit de corps*" is essential in a police department. *Anzaldua*, 793 F.3d at 834–35. Defendants rely on an October 3, 2013 opinion piece that ran in a local newspaper and was endorsed by both the Crystal Police Officers Union and the Crystal Police Supervisors Union. The article states that Watt and another Crystal officer "have recruited a group [Communities United] to attempt to try their case in the court of public opinion solely based on their interpretation and misrepresentation of the facts as they believe them." The piece complains that these efforts have "create[d] a public fervor that smears the reputation of our police department" and a "circus [that] continues to put good officers in bad positions every day." The unions bemoan the "desperate attempt to short circuit the very legal process that has the power to remedy our discipline." They conclude by urging the city council to allow the legal arbitration and grievance process to follow its course.

The Court finds that Defendants have sufficiently demonstrated that Watt's speech had an adverse impact on the police department's operations. The question becomes whether, under the *Pickering* test, any punishment for that speech violated a constitutional right and whether such a right was clearly established at the time of the alleged violation. "At least five circuits have concluded that, because *Pickering*'s constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established' for purposes of . . . qualified immunity." *Hemminghaus v. Missouri*, 756 F.3d 1100, 1114 (8th Cir. 2014) (alteration in original). Furthermore, in applying the balancing test, the Eighth Circuit has made clear that police departments should receive "substantial deference" with respect to their determination that

speech "had caused or would cause dissension and disruption" and to their "response to the actual or perceived disruption." *Anzaldua*, 793 F.3d at 835 (quoting *Shands v. City of Kennett*, 993 F.2d 1337, 1345 (8th Cir. 1993)).

The Court finds that it was not clearly established that the balancing test would tip in Watt's favor because at least two important facts weigh against him: his statement was largely concerned with his own discipline and the disruption his statements caused was not insignificant. *See Hemminghaus*, 756 F.3d at 1114 ("Because Hemminghaus spoke mostly about her own private case, and disruption in the workplace was substantial and not minimal at best, it was not clearly established that *Pickering* balancing would fall in Hemminghaus's favor.") (internal citation and quotation marks omitted). Thus, even if Defendants punished Watt based on his statement to the city council, they did not violate a clearly established right and therefore have qualified immunity. [5] *See id.*

5.  *Interview with the FBI*

Watt's brief mentions in passing that the June 16, 2013 statement to the city council also describes how Watt "reported to the FBI that he believed Defendants were involved in a cover up." This quote is the entirety of Watt's discussion of a report to the FBI. It is conceivable that reporting a cover-up to the FBI could form the basis of a First Amendment retaliation claim. But

---

[5]     Watt seems to argue that the *Pickering* balancing test does not apply where, as here, the speech was directed at promoting efficiency and confidence in the defendant's operations. Watt cites to a footnote in *Campbell v. Arkansas Dep't. of Correction*, 155 F.3d 950, 959 n.7 (8th Cir. 1998), which states: "The *Pickering* balancing test would not work to [the defendants'] advantage since [the plaintiff's] criticisms actually addressed [the defendants'] interest in running the prison in an effective and safe manner, and there was no evidence that the media attention created unrest or any other security risks at [the prison]." *Id.* This statement merely observes that the defendants were correct not to rely on *Pickering* because, on the facts, the balancing test would not weigh in their favor. The statement does not help Watt.

to the extent Watt intends to base his claim on the report to the FBI, his brief's lone and fleeting reference to the alleged report is insufficient to meet his burdens and survive summary judgment.

6.   *Watt's Attendance at the Communities United Rally*

Watt was disciplined for attending a Communities United rally on July 15, 2013, instead of being at home as instructed. The Court will assume that Watt's attendance constituted expressive activity regarding a matter of public concern. The Court finds, though, that Defendants have qualified immunity. The City has a strong interest in maintaining discipline and loyalty in its police department. *See Anzaldua*, 793 F.3d at 835. Watt has not and cannot show that a police department violates clearly established First Amendment rights when it disciplines a police officer because, while on duty, he attended and supported a public rally held by a group critical of the police department that employed him.

**C. Restrictions on Watt's Speech**

In addition to alleging First Amendment retaliation, Watt objects to the conditions placed on his speech. He asserts that the City's order forbidding "Watt to appear or enter any of its property or attend any events sponsored by Defendants" violated his First Amendment rights, and that "the City's order that Watt not speak with anyone about the internal affairs investigations, his personnel status and his private personal matters also placed undue restriction on his free speech rights."

To the extent these restrictions curtailed speech about Watt's private personnel information, the speech did not involve a matter of public concern and was not protected. To the extent the speech implicated public concerns, Watt has failed to show the restrictions violated clearly established rights. On this point, Watt cites, without analysis, to only one case, *Domina v. Van Pelt*, 235 F.3d 1091 (8th Cir. 2000). However, the relevant holding in *Domina* is the

opposite of what Watt needs to support his claim. In that case, the Eighth Circuit held that county

commissioners did *not* violate clearly established First Amendment law when they limited the

time and place members of a county road crew could discuss allegations that a former county

road superintendent had engaged in a sex act with a department secretary. *Id.* at 1095, 1099. Watt

cites to no other law and provides no argument to show that the restrictions on his speech

violated First Amendment rights. He offers only conclusory assertions. The Court finds Watt has

failed to meet his burden of demonstrating that Defendants violated a clearly established law. *See*

*Smith*, 754 F.3d at 546. Accordingly, the Court finds that Defendants have qualified immunity.

### III.    Reprisal Discrimination Claim

The MHRA prohibits employers from "intentionally engag[ing] in any reprisal against

any person because that person . . . opposed a practice forbidden under the [MHRA.]" Minn.

Stat. § 363A.15. Reprisal claims under the MHRA are analyzed using the *McDonnell Douglas*

burden-shifting framework. *See McLain v. Andersen Corp.*, 567 F.3d 956, 969 (8th Cir. 2009).

Watt must demonstrate a prima facie case by showing that: (1) he engaged in statutorily-

protected conduct; (2) Defendants subjected him to an adverse employment action; and (3) there

was a causal connection between the two. *Id.* The burden then shifts to Defendants to articulate a

legitimate, non-discriminatory reason for its employment action. *Id.* The burden then shifts back

to Watt to show pretext. *Id.*

Watt devotes five sentences of his brief to support his prima facie case of retaliation.

Watt does not identify specific communications that he believes were protected conduct. Instead,

he asserts generally, without citation to the record, that he engaged in protected activity when he

opposed "Defendants' intrusive and unnecessary demand for medical records and reports,

disparate treatment based on race, perceived disability, retaliation and hostile environment

harassment." The Court has reviewed the record in search of reports that fit these descriptions and might arguably involve retaliation. Watt fails to meet his burden for any of the speech identified.

### 1. *Watt's Complaints to Therres*

Watt notes he complained to Therres that his suspension for misusing the DVS database was the result of race-based disparate treatment. Watt's complaints to Therres occurred in June or July 2012, many months before Watt was subject to his next adverse employment action. This gap in time is too substantial to support an inference linking the complaints to Therres with an adverse action. *See Smith*, 302 F.3d at 833.

### 2. *Watt's October 2012 Emails*

Watt's October 2012 emails similarly complain about his suspension, questioning "why the only minority officer [is] suspended." The April 2013 suspension for the gun incident is the adverse action closest in time to the emails. This gap of approximately six months is too long to establish a causal connection. *See id.* While it is true that Revering began inquiring into the gun incident a day or two after the October 14 email was sent, any inference of a connection between the emails and the inquiry is undermined by the fact that Revering was unaware of the emails at the time. Even assuming Watt could establish a causal connection because of the proximity of the emails and Revering's inquiry into the gun incident, "proximity alone is insufficient to establish pretext." *Gibson v. Geithner,* 776 F.3d 536, 541 (8th Cir. 2015). To survive summary judgment, Watt must have other evidence showing that the discipline based on the gun incident was in fact unlawful retaliation. He has no such evidence of pretext. Watt's misconduct during the gun incident was serious and deserving of discipline, and Watt has no evidence that any other officer engaged in comparable conduct and escaped punishment.

Any other discipline Watt received was too remote in time from the October 14 email to establish a causal connection. *See Smith*, 302 F.3d at 833.

### 3. Watt's Conversation With Lieutenant Dave Oyaas

In the evening of October 17, 2012, Watt told his friend at the department, Lieutenant Dave Oyaas, that he felt he was being singled out. Even if the Court were to assume this statement could be considered opposition to a discriminatory practice, there is no evidence of retaliation. At the time of the conversation, Revering had already begun inquiring into the gun incident, and any adverse action was six months away.

### 4. Watt's Objections to Medical Information Requests

The record is replete with objections that Watt or his counsel made opposing Defendants' requests for medical information. These objections, though, are not protected opposition within the meaning of the MHRA. "To demonstrate the presence of protected opposition, a plaintiff must show a good faith reasonable belief that his employer engaged in a discriminatory employment practice." *Evans v. Kansas City, Mo. Sch. Dist.,* 65 F.3d 98, 100 (8th Cir. 1995). "[T]he reasonableness of a party's belief must be connected to the substantive law." *Bahr v. Capella Univ.,*788 N.W.2d 76, 83 (Minn. 2010). "If a practice is not unlawful under the plain terms of the MHRA, a party's belief that the practice is unlawful cannot be reasonable." *Id.* at 84. A plaintiff may not rely entirely on his or her "own reasoning and sense of what is discriminatory," because "[a] basis as subjective as this would defeat any attempt to analyze whether a plaintiff had a reasonable belief." *Id.*

As discussed above, Defendants' requests for Watt's medical information and referrals for medical exams were reasonable and not too broad or intrusive. Accordingly, Watt did not engage in statutorily protected conduct by opposing these requests and referrals. *See Thomas*,

483 F.3d at 531 ("Thomas did not engage in statutorily protected conduct by opposing [the City's doctor's] legitimate, focused request for Thomas's medical records, a request both job-related and consistent with a business necessity.").

### 5. Watt's EEOC Complaint

Watt engaged in protected activity when he filed his race discrimination complaint with the EEOC and MDHR. As discussed above, the June 3 home assignment is the adverse action closest in time to the April 2013 complaint. However, there is no evidence linking the complaint to the home assignment, other than temporal proximity, which is insufficient by itself to support Watt's claim. *See Gibson,* 776 F.3d at 541. Any other adverse action suffered by Watt is too remote in time to establish a causal link with the complaint. *See Smith*, 302 F.3d at 833.

### 6. Watt's Email to Lynn

On May 7, 2013, Watt emailed Lynn to say he was "being targeted." Watt's vague statement is not sufficient to constitute opposition to a discriminatory practice. *See Ferguson v. Michael Foods, Inc.*, 74 F. Supp. 2d 862, 872 (D. Minn. 1999). Even if the Court were to assume otherwise, Watt does not create a trial-worthy issue because he cannot show pretext. The stated rationale for the home assignment was the gun incident and Lynn's opinion. Watt has not adduced any evidence showing that the home assignment was actually based on Defendants' desire to retaliate against him for emailing Lynn in the first place. Any other adverse action suffered by Watt was too remote in time to establish a causal link to Watt's communications with Lynn. *See Smith*, 302 F.3d at 833.

### 7. Watt's Statement to the City Council

Watt's statement to the city council alleges that Watt suffered "retaliation for complaining about misconduct by police management, especially my complaint about the

Ramirez cover up." To fall under the MHRA, Watt's speech must be directed at opposing the discriminatory practices forbidden under the MHRA. "A general voicing of issues and concerns does not constitute protected opposition to discrimination." *Cannon v. Minneapolis Police Dep't*, 783 N.W. 2d 182, 191 (Minn. App. 2010).

Watt asserts that the Crystal police leadership violated their legal obligation to investigate each complaint the department receives when they covered up and failed to investigate the Ramirez family's complaint. In his statement to the city council, Watt attributes this failure to the possibility that the incident involved misconduct by another police agency. These assertions may constitute alleged violations of police department procedures and various state laws, but they do not implicate practices forbidden by the MHRA. Therefore, Watt's complaints about the handling of the Ramirez family incident, and his complaints that he was punished for voicing such opposition, are not statutorily protected conduct within the meaning of the MHRA.

8. *Watt's Attendance at the Communities United Rally*

On July 15, 2013, Watt attended a Communities United rally. Watt points to a police department memo that describes the speakers at the rally alleging there was a police cover-up and that Watt and others were retaliated against for reporting the cover-up. Again, such complaints of police misconduct do not involve opposition to or discussion of discriminatory practices forbidden under the MHRA and thus are not protected conduct.

## IV.    Minnesota Whistleblower Act Claim

The Minnesota Whistleblower Act prohibits retaliation against an employee who "in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule." Minn. Stat. § 181.932, subd. 1. To establish a prima facie case under the statute, Watt must show: (1) he engaged in statutorily protected conduct; (2)

Defendants took an adverse employment action against him; and (3) a causal connection existed between the protected conduct and the adverse action. *Skare v. Extendicare Health Servs., Inc.*, 515 F.3d 836, 840 (8th Cir. 2008). The burden then shifts to Defendants to provide a legitimate reason for its actions, which Watt can rebut by showing pretext. *Id.*

Defendants argue that Watt did not engage in protected conduct because he had "no whistle to blow." *Obst v. Micotron, Inc.*, 614 N.W. 2d 196, 203 (Minn. 2000). The October 7, 2012 email is the only speech that Watt cites as a specific example of a protected report under the whistleblower statute. Watt points to that email's reference to the cover-up of the Ramirez family incident. However, as discussed above, when the email was sent, the complaint about the cover-up had already been filed with the City and the city council had discussed it at a public meeting. Watt's email merely referenced already known information. He did not make a report within the meaning of the statute. *See id.*; *see also Harnan v. University of St. Thomas*, 776 F. Supp. 2d 938, 948 (D. Minn. 2011) ("A report is also not a mere mention of already known information.") (internal quotation marks omitted). Watt fails to point to information in any of his communications that shows he engaged in statutorily protected conduct. Accordingly, the Court finds that Watt's whistleblower claim fails.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.  Defendants' motion for summary judgment [Docket No. 21] is GRANTED, and Plaintiff's claims are DISMISSED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 2, 2015

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge